BAXTER J. BUTLER *v.* SMITH & THARP.

1. EVIDENCE: PAROL EVIDENCE ADMISSIBLE, TO SHOW FAILURE OF CONSIDERATION.—Parol evidence is admissible, to show that a written agreement signed by the defendant was not to be binding, unless the plaintiff would also procure the signatures of other parties to it; such evidence does not add to, or vary, the terms of the written instrument, but establishes a failure of consideration.
2. AGENCY: WHEN DETERMINABLE AT THE WILL OF EITHER PARTY.—An agency to do particular services from time to time, for a compensation to be paid as the services are rendered, and without any agreement as to the time of its continuance, is determinable at the pleasure of either party.
3. EVIDENCE: PAROL: AGENCY: CASE IN JUDGMENT.—The plaintiffs, with other merchants of the city of Vicksburg, signed the following agreement with the owner of a wharf-boat, lying in front of the city: " We, the undersigned, as per our names attached, agree to pay B. J. Butler (the defendant) the following rates (afterwards specified) for receiving and storing—he agreeing not to tax boats the two and a half per cent. now charged by him," for collecting their freight bills: the plaintiffs afterwards gave the defendant notice that they would no longer be bound by the agreement, alleging as a reason therefor, that he had promised when they signed it, that he would procure the signatures of the merchants generally, in Vicksburg, to the instrument, and that he had failed to get the signatures of as many of them as represented one-half of the receipts at that port. Upon the defendant's refusal to deliver the goods of the plaintiffs received by him, after the giving of the notice, without payment of the rates specified in the agreement, the plaintiffs brought replevin therefor. *Held*, 1st. That parol evidence of the alleged promise of the defendant to procure the signatures of other merchants in Vicksburg, and his failure to perform it, was admissible to show a failure of the consideration of the agreement. 2d. That such promise and failure, constituted a sufficient ground for the plaintiffs' avoidance of the agreement; and 3d. That the effect of the agreement was merely to constitute the defendant an agent of the plaintiffs, to receive and store their goods, for an indefinite period, at a stated compensation, to be paid as the services were rendered, and as such, was determinable at the option of either party.

4. SHIPPING: CONSIGNEES' RIGHTS TO THE GOODS.—The consignees in a bill of lading, are *prima facie* entitled to the possession of the goods, and they have such a special property in them, as to give them a right of action for the recovery of the possession. See 2 Saund. R. 47, d.; 1 Chit. Pl. 7; Ib. 175; *Smith v. James*, 7 Cow. 328; *Potter v. Lansing*, 1 J. R. 215; *Chandler v. Sprague*, 5 Met. 306; *Griffith v. Ingledew*, 6 Serg. & Rawle, 429.

5. CONTRACT: CONSIGNEE, WHEN CONSIDERED OWNER: CASE IN JUDGMENT.—An agreement was entered into, between the city of Vicksburg and the owner of a wharf-boat lying in front of the city, that the latter would not charge any storage or wharfage, for any " goods left with him for any citizen of the place." *Held*, That the agreement embraces not only goods which actually belong to citizens of Vicksburg, but also all goods which are consigned to them on storage for others.

ERROR to the Circuit Court of Warren county. Hon. J. S. Yerger, judge.

The case is very fully stated in the opinion of the court.

*Marshall* and *Miller*, for plaintiff in error.

We desire to present but two points, upon which we think the court below fell into error. The first arises under the agreement between numerous merchants, defendants in error included, of Vicksburg and plaintiff in error, by which they bound themselves to pay him certain specified rates for receiving and storing their goods; and the second, in the interpretation given to the agreement of Thomas Porterfield, Butler's vendor, with the city.

1. The agreement between Smith & Tharp, and others, with Butler, was held, by the court below, to be a mere power of attorney, or writing authorizing Butler, as agent, to receive and store goods for the parties signing it, and that they could revoke the agency whenever they thought proper to do so, whether he was willing or not. Such, we insist, is not the fair construction, nor legal import, of the instrument. We contend that it is a valid contract, founded upon a sufficient consideration, which they had no right to cancel, nor rescind, without his consent. True, it is not specified how long the arrangement between the parties was to continue. But the lease of Butler was recorded in the Probate Clerk's office. Its duration was generally and well understood; and this contract was designed to operate until his lease expired, or so long as the parties might respectively remain in business in Vicksburg.

In good faith, Butler prepared to carry out the agreement on his part. He released the boats from the two and a half per cent. they had long been accustomed to pay him. He incurred the expense of publishing notices, tariff of rates, cards, &c., before any attempt was made by Smith & Tharp to cancel the agreement, or any intimation given that they wished to do so; and we insist that he had just right to demand and receive the benefits of their contract. If so, it is admitted his charges in this case were in accordance with the tariff specified in that contract, and he was not bound to give up the goods until his charges were paid.

2. The court below held, that, under the agreement of Thomas Porterfield with the city of Vicksburg, Butler had no right to charge anything for receiving or storing goods, consigned to a citizen of Vicksburg, if taken off the wharf-boat within twenty-four hours, no matter who they belonged to. Assuming we are wrong in our first position, we insist that the proper construction, or legal effect of that agreement, is not in accordance with the view taken of it by the court below. Without that agreement, there could be no controversy about the right of Butler to make a reasonable charge, for storing and taking care of all goods deposited with him, on his wharf-boat. What rights, then, did he, or Porterfield, intend to give up by that agreement? Porterfield was in possession of the landing, under a lease having then about nine and a half years to run, from C. K. Marshall, the admitted legal owner. Voluntarily, and without any consideration whatever, he agreed, to accept the city as his landlord, in lieu of Mr. Marshall, and to the passage of ordinances, to facilitate the collection of wharfage from steamboats, which could not have been passed, in view of his contract with Mr. Marshall, without his consent; and he established rules for depositing goods upon his boat, and for passing persons and freight over it. Two classes of cases are provided for,—one applicable to citizens of Vicksburg alone, and the other to all other persons. To the former he granted the right of deposit upon, and to the latter the right of transit over, his boat, for all freights. If the agreement be not a *nudum pactum*, and void, we say he released his right to charge the citizens of Vicksburg, upon goods left on his boat for them; that is, their property, belonging to them. It was well known, that, as a general thing, all goods landed

at Vicksburg, owned by persons in the interior, came consigned to some citizen of Vicksburg. Boats would not bring goods to this port, unless there was some one here to receive and pay freights upon them. No one knew this better than Porterfield. If, therefore, these words, employed in his agreement, "I will charge no wharfage or storage for any goods left on my boat, for any citizen of this place," be construed to embrace goods merely consigned to a citizen of Vicksburg, in which he had no ownership or interest, the latter part of the sentence could have very little or no practicable meaning; there would have been no necessity or object in providing for the second class of cases at all. But, if those words are held to mean, as we know was the design of Porterfield, to include only such goods as were the property of citizens of Vicksburg, then the whole instrument is consistent and harmonious, and effect given to every part of it. The word "for" means, in one of its definitions, "belonging to;" and in that sense, we say, it is used in this agreement. If our construction of this agreement be correct, then, no matter whether Smith & Tharp had the right to annul their contract with Butler, without his consent or not, there can be no doubt he had the right to charge for receiving, paying the freight upon, and storing the goods in controversy. And if he had such right, his lien upon them for, and authority to retain them until his charges were paid, is not disputed.

*H. J. Harris*, for the defendants in error,

Filed an elaborate brief, in which he contended for the following propositions:—

1. The testimony offered to show a failure of consideration, was competent. The defendants had promised to procure the signatures of the merchants generally, and, relying on this, the plaintiff had signed the agreement. The defendant failing to comply, the agreement was without consideration. *Cozzens* v. *Whitaker*, 3 Stew. & Port. 329; *Becker* v. *Vrooman*, 13 John. 301; *Johnson* v. *Miln*, 14 Wend. 195; *Basten* v. *Butten*, 7 East, 480; *Lewis* v. *Cosgrave*, 2 Taunt. 2; *Runyan* v. *Nichols*, 11 J. R. 548.

2. The effect of the agreement was, at most, to constitute the defendant the agent of the plaintiff; and, as there was nothing in the agreement to the contrary, either party might revoke it at

pleasure. Story on Agency, § 476; *Prichard* v. *Martin*, 27 Miss. 305.

3. The consignee has an interest in the goods, and if the property be stolen, it may be alleged, in the indictment, to be his. 2 Rus. Cr. 155–57. In many respects, he is considered as the owner; at least, his ownership cannot be disputed by the defendant.

Mr. Harris also contended that the Mississippi river, at Vicksburg, was a navigable stream, although above tidewater, and that the riparian proprietor had no right to the use of the bank between high and low water mark; or to obstruct the stream of the river with his boat; and, on this point, he cited and commented on the following authorities: *The Propeller Genesee Chief* v. *Fitzhugh*, 12 How. (S. C.) 454; *Bullock* v. *Wilson*, 2 Porter, 436; *Wilson* v. *Forbes*, 2 Dev. 30; *Ingram* v. *Threadgill*, 3 Dev. 59; *Shrunk* v. *Schuylkill Company*, 14 S. & R. 71; *Commonwealth* v. *Fisher*, 1 Penn. R. 462; *Carson* v. *Blazer*, 2 Binn. 475; *Freytag* v. *Powell*, 1 Whart. 536; *The Mayor of Mobile* v. *Eslava*, 9 Port. 577; *Naglee* v. *Ingersoll*, 7 Barr, 185; *Cox* v. *The State*, 3 Blackf. 193; *Hart* v. *The Mayor of Albany*, 9 Wend. 571.

HANDY, J., delivered the opinion of the court.

This was an action of replevin, brought by the defendants in error, to recover certain goods from the plaintiff in error, which, upon demand, he refused to deliver.

The material facts shown by the record appear to be, that the goods in controversy were brought by steamboats from the city of St. Louis, and the city of New Orleans, to the city of Vicksburg, some time after the 12th of November, 1857, consigned to the defendants in error, who were commission merchants at Vicksburg, for delivery to the owners, residing in the interior of this State, and the goods were left by the steamboats upon the wharf-boat of the plaintiff in error, lying in the Mississippi river, and attached to the landing at Vicksburg, upon which wharf-boat the plaintiff in error was in the habit of receiving from steamboats, goods shipped upon them for delivery at Vicksburg, and to be delivered to the persons entitled to them; that, prior to the 1st day of November, 1857, it was the uniform custom of the plaintiff in error to charge

steamboats two and a half per cent. on the amount of their freight bills, which he advanced to them, and afterwards collected; but that, shortly before that time, he entered into a written agreement with certain merchants in Vicksburg, including the defendants in error, in these words, "We, the undersigned, as per our names attached, agree to pay B. J. Butler the following rates for receiving and storing, he agreeing not to tax boats the two and a half per cent. now charged by him,"—then follows the articles, and the rates specified, and the signatures; that, in consequence of this agreement, he ceased to make any charge against steamboats, for advancing and collecting their freight bills, on the 1st of November, 1857, and that after the agreement was made, he was at considerable expense in publishing cards and notices.

It further appears, that on the 29th of October, 1857, the defendants addressed a letter to the plaintiff in error, stating that they had signed the agreement above mentioned, with the understanding that it was to be adopted by the merchants generally; and as he had failed to obtain the signatures of several of the leading merchants there, and those representing a majority of the receipts at that port, that the consideration for the agreement had failed, and requesting that their names should be erased from it: to which the plaintiff in error replied, on the 30th of October, 1857, stating merely that the agreement would speak for itself, and that he would hold them responsible for its fulfilment, and would hold their freight until the charges agreed on therein should be paid.

It further appears, that the plaintiff in error claimed the right to the landing and premises where the wharf-boat lay, as the purchaser of an unexpired lease from C. K. Marshall to Thomas Porterfield, who, previous to his assignment of it to the plaintiff in error, entered into an agreement in writing, whereby he agreed to accept the city of Vicksburg as his landlord of the premises — to abide by such ordinances as the city might pass, in relation to the amount of wharfage against steamboats — and that he would "charge no wharfage or storage *for any goods left on his boat for any citizen of this place* (Vicksburg), until they have remained there over twenty-four hours after notice to such citizen of their being on board;" and that the plaintiff was subject to the same obligations in the premises as Porterfield.

It is further shown, that within twenty-four hours after the receipt of the goods upon the wharf-boat, the defendants in error demanded the goods of the plaintiff, and offered to pay the freight on them which he had paid to the steamboats; but that the plaintiff refused to deliver them, unless the defendants would also pay the plaintiff's charges for wharfage and storage, which are admitted to be reasonable, if he had the right to demand payment of them. This the defendants in error refused to do, and thereupon brought this suit.

The case was submitted for the decision of the court below, both as to questions of law and of fact, and judgment was rendered for the defendants in error.

The first ground of error assigned, is upon the opinion of the court below, that the defendants in error had the right to abandon the agreement entered into with the plaintiff, in relation to the payment of certain sums to him for receiving goods, without his consent. This involves two questions — 1st. Whether, under the circumstances in which the agreement was made, it was binding upon the defendants in error ? and 2d. If it was, whether he had not the right to abandon it, upon giving notice to the plaintiff?

Upon the first point, the evidence justifies the conclusion, that the agreement was signed by the defendants with the understanding, that it was not to bind them, unless it was adopted by the merchants generally of Vicksburg, and that the plaintiff had failed to obtain the signatures of merchants there, representing a majority of the receipts at the port. This is distinctly stated in the letter of the defendants to the plaintiff, and is not denied in his reply. On the contrary, it is virtually admitted; for he asserts his right to hold them bound upon the terms of the agreement, and the court below was warranted in taking it as an admission of the fact. Then it is the case of an agreement, made subject, for its operation, to a condition subsequent, and which had failed; and of course, it was not obligatory upon the defendants, for whose protection the condition was required. This condition was independent of the terms of the agreement, or the things agreed to be done, and therefore it pertained to the consideration upon which the agreement was founded. The evidence showing it, does not vary or add to the obligations which the defendants had undertaken, by the terms of

the agreement, but goes to the performance of a condition as the basis on which it was founded; and for this reason the evidence was competent in law, and it fully warranted the opinion, that the consideration for the agreement had failed, and consequently, that the defendants were not bound by it.

But if the agreement was binding, had not the defendants in error the right to put an end to it, or was it irrevocable? This depends upon the nature and legal effect of the agreement, which must be determined from the circumstances under which it was made, and its terms.

In its nature, it was an agreement constituting the plaintiff the agent of the defendants, to receive and store goods brought to the port for them by steamboats, without limitation of time; and for that service, they agreed to pay him at certain stipulated rates. The plaintiff's wharf-boat had been previously established, and was engaged in the business of receiving and storing goods, so that he was not induced to build the boat, or to enter upon the business, by the consideration of the agreement with the defendants. Thus far it was merely the employment of an agent for an indefinite time, to perform certain services from time to time, at a stipulated price, and either party would have had the right to put an end to the agency.

Does the circumstance, that the plaintiff gave up his right to receive two and a half per cent. for steamboats, for advancing the money upon their freight bills, as the consideration for this agreement, render the agrcement irrevocable? It appears clearly not; for upon the revocation of the agreement, the plaintiff would have had the same right to make any legal charges against steamboats, for attending to their business, which he had before this agreement was made; and as to his compensation for receiving and storage, before notice of abandonment of the arrangement by the defendants, their liability is not questioned.

There appears, therefore, to be nothing in the transaction to take it out of the general rule, that an agency to do particular services from time to time, to be paid for as the services are rendered, and without any agreement as to the time of its continuance, is determinable at the pleasure of either party.

Another question presented is, whether the plaintiff in error was

entitled to charge the defendants for receiving and storing the goods in controversy, with reference to the agreement made by Porterfield with the corporation of Vicksburg; in other words, whether that agreement embraces goods consigned to a resident merchant of Vicksburg, to be forwarded to the owner, who was not a citizen of Vicksburg, and which were received and stored by the plaintiff in error.

That agreement stipulates, that he will "charge no wharfage or storage, for any goods *left on his boat for any citizen of the place*" (Vicksburg); and the question presented is solved, as a legal proposition, by ascertaining who had the immediate right to receive the goods from the plaintiff in error.

By the terms of the bills of lading,—which it appears had been delivered to the defendants in error,—the goods were to be delivered to them; and the plaintiff, standing in the position of agent for the steamboats, in receiving them, was bound to carry out the special contract which the steamboats had thereby entered into, to deliver them *to the* defendants. Neither the steamboats, nor their agent, the plaintiff, had the right to recognize any other person as entitled to receive the goods, than the persons to whom they were consigned, and as between the carriers and their agent on the one part, and the consignees on the other, the latter were to be regarded as the owners. Much less, if the plaintiff in error was acting as the agent of the defendant, in receiving the goods, could he deny their right to receive them at his hands, and his liability to deliver them accordingly. Abbott on Shipp. 323 (5th Ed.).

But it is well settled, upon general principles, that *prima facie* the consignees had the right of possession of the goods, and such a special property in them as to give them the right of action for the recovery of possession. 2 Saund. Rep. 47, d. 1; Chitty Pl. 7; Ib. 175 (6th Am. Ed. 1833); *Smith* v. *James*, 7 Cowen, 328; *Potter* v. *Lansing*, 1 John. R. 215; *Chandler* v. *Sprague*, 5 Metcalf, 306; *Griffith* v. *Ingledew*, 6 Serg. & R. 429. In this case, there is nothing to destroy the legal presumption, that the consignees were entitled to have the goods delivered to them, but much to confirm it.

Upon legal principles, therefore, these goods must be regarded as having been *left* with the plaintiff in error, *for the defendants in error*, who were citizens of Vicksburg, and within the terms of the

Butler *v.* Smith & Tharp.

stipulation, and therefore were not chargeable by the plaintiff in error.

But the case appears also to be within the spirit and contemplation of the stipulation.

The agreement was made by the city of Vicksburg, with the plaintiff's assignor, and must have been made for the purpose of promoting the general commerce and prosperity of the city. It is a matter of notoriety, that a very large portion of the business and commerce of the city, consisted in the receiving and forwarding of goods by commission merchants there; and considering that fact, it would indeed have been strange, if the corporation in making stipulations to facilitate the receiving of goods at the port, had not had in view so large and important an interest, and had entered into an arrangement not intended to embrace it. And while it is true, that such charges would be ultimately paid by the owner of the goods residing out of the city, yet such charges would have a tendency to incumber the business of commission and forwarding merchants, in a manner calculated to diminish it, and thereby operate as a discrimination against them in their business, which was not applied to other traders and citizens receiving goods on their own account. It is not reasonable to suppose that such a discrimination was intended.

We are, therefore, of opinion that the court below decided correctly, in holding that these goods were within the stipulation, and that the plaintiff in error was not entitled to wharfage and storage for them.

The question is also somewhat discussed by counsel, as to the right of the plaintiff in error, as a riparian proprietor, to the use and occupation of the Mississippi river to low water mark, on the ground that that river is not in law a navigable stream. If that question was necessary to the determination of this case, it has been settled by this court, in the recent case of *Commissioners of Homochitto River* v. *Withers*, 29 Miss. R. 22, which has been affirmed on writ of error by the Supreme Court of the United States.

Let the judgment be affirmed.